In the matter of the petition of THOMAS FALVEY for a writ of Habeas Corpus. Also *in re* BYRON KILBOURN, *Ibidem.*

When the supreme court issues the writ of *Habeas Corpus*, to inquire into the cause of the imprisonment of a citizen of the State, it has the right further to inquire into the matter, and determine whether the committing body or magistrate had jurisdiction or not.

The legislature has power to institute an inquiry into the truth of an alleged bribery of any of its members, or of the members of a previous legislature connected with the disposal of a trust committed to the legislature of the State, and continuing under its present and future guardianship and supervision, and in the exercise of such power, it must necessarily have power to, and may compel the attendance of witnesses before it, or before a committee of either house, or a joint committee of both houses, and compel such witnesses to testify; and also to inflict punishment, as for a contempt, upon such witnesses for their refusal to attend or testify.

In a case where the legislature has constitutional power to institute an inquiry and investigation, the manner of conducting such inquiry and investigation rests in the sound discretion of the legislature.

The supreme court has no appellate jurisdiction from, or supervisory powers over, the proceedings of the legislature, in a matter within the constitutional jurisdiction of that body.

It should seem that the rules which, in a court of law, would excuse a witness from answering questions tending to criminate him, have no application in investigations before the legislative body of a State.

This case came before the whole court at the January term, A. D. 1858. The material facts are all stated in the opinion, by Mr. Justice Cole. The other Justices delivered oral opinions on the occasion of pronouncing the judgment, concurring therein, but they have not been written out or furnished to the reporter.

*Arnold, George B. Smith and Palmer,* for the petitioner.

*Orton, Knowlton and Sleeper, contra.*

In re Falvey and Kilbourn vs. Massing.

*By the Court*, COLE, J.  This case presents for our consideration several novel, interesting and important questions. The petitioner states substantially in his petition for a writ of *habeas corpus*, that he is imprisoned and restrained of his liberty in the city of Madison, by one Francis Massing; that he is not committed nor detained by virtue of the final judgment or decree of any competent tribunal, of civil or criminal jurisdiction, nor by virtue of any process, judgment or decree, or execution mentioned or enumerated in section two, chap. 124, of the R. S.; but the cause and pretence of his imprisonment and restraint, according to his best knowledge and belief, is exercised and continued by the said Massing for the following alleged and pretended causes, that is to say,: That on or about the 21st day of January, A. D. 1858, the legislature of Wisconsin passed a joint resolution of the following import: "*Resolved*, by the Assembly, the Senate concuring, That a joint committee, composed of three members of the Senate, and five of the Assembly, be raised, whose duty shall be, fully and impartially, to investigate into the frauds, bribery, and corrupt acts, reported, or alleged to have been perpetrated or committed by members of the legislature, or others, in the disposal, or in procuring the disposal, by the legislature of this State, in the year 1856, of the lands granted to this State, to aid in the construction of railroads, by act of Congress, approved June 3, 1856; and into any and all cases of alleged bribery and other corrupt acts, on the part of any rail road company, by any of the officers, stockholders' or agents thereof, or other individuals, in securing, or attempting to secure, the lands, so as aforesaid granted, for themselves, or for any, and what company, or companies, or in the procuring the appointment of themselves, or others as directors of the Wisconsin and Superior railroad company, or in procuring, or attempting to procure the resignation of any such director, at

any and what time; and also whether any and what members of the legislature of the year eighteen hundred and fifty-seven, or other person, or persons, and whom, received any stock, bond, money, or other valuable thing, or accepted the promise that he, or they, should receive at any and what time, any stock, bond, money, or other valuable thing, for preventing or assisting in preventing an investigation into the alleged frauds, bribery or corrupt acts, aforesaid, by the legislature last aforesaid. And said joint committee, and a majority of the members thereof, are hereby invested with plenary power to perform and discharge the duty, by this resolution enjoined; and in the exercise of the plenary power aforesaid, among other things, may send for and compel, the attendance of persons before them, and the production of papers, documents, and records for their inspection and use as evidence.

Said committee shall also have power to appoint a clerk or clerks, whose duty it shall be to do such writing as shall be directed by said committee.

Said committee shall also, among other things, by any member thereof, have power to administer to persons brought or appearing before them as witnesses, all necessary oaths; and moreover, may exercise the powers conferred on a legislative committee by section twenty-two of chapter fifty-four of the Revised Statutes.

Said committee shall, with all reasonable dispatch, discharge the duty hereby imposed, and report to the legislature the facts found and the testimony taken by them.

The said resolution was adopted.

That a joint committee was appointed as contemplated by the said resolution, and that on or about the 8th day of February, instant, the petitioner was served with an instrument or process purporting to be a subpœna, and to be signed by the speaker and chief clerk of the assembly, commanding him, the petitioner, to personally appear before said joint committee,

at Madison, and testify and give evidence upon matters of inquiry before said committee on the 9th day of February, instant; that the petitioner failing to appear before said committee at said time and place mentioned in said instrument or process, was on the 9th day of February, arrested and taken into custody by said Massing; and was subsequently arraigned before the said Assembly on the morning of the 10th instant, for an alleged contempt; 1st, for failing to appear: 2d, for neglecting to answer interrogatories propounded to him, the petitioner, by said committee,; and that thereupon the assembly adopted the following resolutions; *Resolved*, that the neglect or failure of Thomas Falvey to appear before the joint investigating committee, composed of Denison Worthington, Philemon B. Simpson, and Edwin Wheeler of the Senate, and James H. Knowlton, Z. P. Mason, J. W. Earle, J. E. Vinton, and Alexander Cotzhausen, of the assembly, in compliance with the mandate of the writ of subpœna of this assembly, served upon him on the eighth instant, as fully appears by the said writ, and the affidavit of the service thereof indorsed thereon, now on file with the chief clerk of this house, be, and the said neglect and failure is hereby declared, a contempt of this house.

*Resolved*, That the refusal of Thomas Falvey to answer the questions put to him by a member of the joint investigating committee, on the 9th instant, and which questions were certified to this house by Denison Worthington, chairman of said committee, and are now in writing on file with the chief clerk of this house, be, and said refusals are hereby declared a contempt of this house. That the petitioner prayed to be heard in answer to said charge of contempt, by counsel, which was then and there refused, and that the petitioner gave an answer to the said charge in writing, which the Assembly declared by resolution to be insufficient, and that the said Assembly did, on the 11th day of February, resolve as follows:

*Resolved*, That Thomas Falvey be continued in close custody, by the Sergeant-at-arms of this house, or in his absence by his assistant, during the term of ten days from the day of the date hereof, or until discharged by due course of law, which imprisonment is hereby adjudged as punishment for the contempt of the said Thomas Falvey, in failing to appear before the joint investigating committee, of which Denison Worthington is chairman, and which contempt was solemnly adjudged by this house on the 10th instant.

*Resolved*, That the time of passing judgment upon Thomas Falvey for his contempt already adjudged by this house for refusing to answer questions put to him by a member of the joint investigating committee, be and the same is deferred until other order in the premises be taken by this house.

And the petitioner averred, that, as he was advised and believed, the legislature had no constitutional power or authority to pass the said joint resolution, or the said Assembly to issue the said subpœna, or thus to arrest and arraign the said petitioner; and further, as the petitioner believed, the said Massing had no sufficient warrant, process or precept, in virtue of which he now imprisons and restrains the petitioner; and the petitioner prayed that a writ of *habeas corpus* might issue to the said Massing, commanding him to have the petitioner before this court, to be dealt with according to law. To the writ issued in accordance with the prayer of the petitioner, Massing made return in substance, that he was the Sergeant-at-arms of the Assembly, one of the houses of the legislature then in session, and that he held and detained the petitioner as such Sergeant-at-arms of the Assembly, under and by virtue of the first resolution above mentioned, passed by the Assembly on the 11th day of February.

The counsel who opened the argument for the petitioner, seemed to anticipate that some question might be made as to the right and power of this court to inquire into the author-

ity of the body instituting the proceeding, in the progress of which the commitment was made, and determine whether that body had or had not exceeded its jurisdiction in the premises. But I did not understand that this power of the court was seriously questioned by the counsel for the respondent; at all events, I do not think that the contrary doctrine could be successfully maintained. Upon principle it would seem to be clear that when this court issued the writ of *habeas corpus* to enquire into the cause of the imprisonment of a citizen of the state, it must from necessity have the right further to inquire into the matter, and determine whether the committing body or magistrate, had jurisdiction or not. Otherwise the issuing the writ would be an idle ceremony, and really to no purpose. But this question has been settled, as well by the authorities as by the express provisions of the statute. *In re Sherman M. Booth*, 3 Wis. 1 ; *In re Blair*, 4 id,; 3 Hills, 649, note j.; *The People vs. Carsels*, 5 id., 164 ; §§ 18 & 19, chap. 124, R. S. Assuming then, without further argument, the proposition that this court has the power to inquire into the authority of the legislature to enter upon the investigation of the matters named in the joint resolution, we are next to determine whether the subject matter of this resolution was a proper subject for the investigation of the legislature, and if so, whether the investigation could be made in the manner contemplated by the resolution. For it would seem to follow as a necessary consequence, that if the legislature could enter upon the investigation at all in the manner proposed, in order to make such investigation effectual, there must be some way of compelling the attendance of witnesses before the committee, and to give evidence. Otherwise the whole investigation might be obstructed, at the outset, by the neglect or refusal of witnesses to come before the committee and answer questions pertinent to the matter of inquiry.

Had, then, the present legislature the constitutional right

and power to investigate into the frauds, bribery, and corrupt acts alleged to have been committed by the members of the legislature of 1856, or others, in the disposal, by the legislature, of the lands granted by congress to this state to aid in the construction of certain railroads, and into any cases of alleged bribery and other corrupt acts on the part of any railroad company, by its officers or agents, in securing for themselves said lands, or in securing the control and direction of any railroad company to which the lands were granted; and also whether any members of the legislature of 1857 were in any way bribed to suppress or prevent an investigation into these alleged frauds?' Although the field of inquiry here opened up is very broad, and the transactions multifarious, yet it seems to me the investigation can be justified upon several grounds. In one view, suggested by one of the counsel for the respondent, (Mr. Orton,) the investigation might be demanded not only as eminently proper, but as absolutely called for to preserve the good faith and honor of the state. Congress, by the act of June 3d, 1856, (see chap. 43, *Acts of Congress* for 1856,) made a grant of public lands to this state for the purpose of aiding in the construction of certain railroads. The state, by an act of the legislature, (chapter 118, general laws, 1856,) accepted this grant, and undertook to execute the trust created by the act of congress. Thus the state became a *quasi trustee*, and was bound to see that the proceeds of the lands were faithfully applied to the purposes of the grant. The legislature, deeming it improper or unwise that the state itself should undertake to carry on these works, chartered certain railroad companies, and granted to those companies all the estate and interest of the state in the lands donated to it by congress to be disposed of by these companies, under certain limitations, and the proceeds exclusively applied to the construction of the roads. (See chap. 122 and chap. 137 *Session Laws* of 1856.) Had not, therefore, the

legislature the right to inquire into the manner these companies were managing their roads? Whether they were honestly and faithfully discharging their trusts, in applying the proceeds of the grants to the construction of the roads, or whether, in fact, those public lands were becoming incumbered with the payments of large amounts of bonds used for corrupting members of the legislature and officers of the state? Was it not a duty which the legislature owed to the people of the state to inquire whether these companies had squandered any of these lands, or had encumbered them in any manner with the payment of debts contracted for a corrupt purpose, or whether they were disregarding the obligations of their trust? An examination into these alleged abuses might show the necessity of some further legislation in regard to these grants, some more stringent regulation of the company to secure the application of them to the early and speedy completion of the roads, or perhaps some amendments of the charters, to prevent future mischief. Experience had demonstrated that it was essential for the legislature frequently to exercise a visitorial power over corporations, and to examine into their condition and affairs, as well to protect the interest of stockholders as the public against the malpractices of rapacious and dishonest corporation officers and agents. Hence the wisdom of such provisions as section 22, chap. 54 of R. S. But again, an investigation into these various alleged acts of bribery and corruption might be necessary with a view of adopting some legislation to deter others from like misconduct. Information might thus be obtained which would enable the legislature to remedy defects in existing laws, and effectuate the great ends of public justice.

Still it is said that this power of the legislature to investigate must have a limit somewhere, otherwise a committee might, for partizan and malicious purposes, penetrate and drag to light the most secret and private matters of any citi-

zen of the state. One of the counsel for the petitioner asks if the legislature would have a right to institute an inquiry into his conduct as an attorney, or into matters connected with his professional business? Probably not. But there is a wide difference between inquiring into a citizens private affairs and investigating the matters embraced in the joint resolution. If the objects and results of this investigation may be such as already suggested, is it not competent for the legislature to make it? Remember we are now only considering the power, the constitutional right of the legislature, to investigate these transactions. The policy, the expediency of exercising the power, and the manner of conducting the investigation, rests, in my judgment, entirely in the sound discretion of the legislature. For if the legislature have the power to investigate at all, it has the power of choosing how the investigation shall be had; whether by a committee of one house, or by a committee of each house, acting separately, or by committees acting jointly.

For the reasons suggested, and others which might be given, I have no doubt of the power of the legislature to investigate the matters named in the joint resolutions, either by a joint committee, or by a committee of either or both houses acting independently, or the legislature might have investigated into these matters in any other manner which to it might seem most convenient and proper. But it is objected that if the investigation is had by a joint committee, a witness in refusing to appear before a committee, thus constituted, or in refusing to answer questions put by such a committee, is not guilty of a contempt of either house of the legislature, but is guilty of a contempt of the joint committee, or in other words, of the legislature, which it is contended is an absurdity in its terms. How, it is asked, can a witness be punished for this double offence? By which house of the legislature? Or will both houses assume jurisdiction, and punish twice for

the same contempt? Under the constitution, it is insisted, the power to punish for a contempt is vested exclusively in each house acting separately, and not jointly. As a general proposition this probably will not be denied; and yet it is not universally true. Suppose the Legislature assembled in joint convention, as by the law of this State it is required to do, for the purpose of choosing United States senators, or regents of the University, has it not the power, when thus assembled, by the parliamentary law, the law of self preservation, to punish, as for a contempt, any person guilty of disorderly and riotous conduct which would interrupt or disturb its deliberations? Manifestly it would have. In the present case, however, we are relieved from any difficulty attending this question, by the act of the Legislature, approved February 3, 1858. That act expressly makes the refusal of a witness to appear and testify before the joint committee, a contempt of the house, whose process has been disobeyed. The exigency of the *subpœna* not only required the witness to appear, but also to answer any question pertinent to the matter of inquiry before the committee; and refusal to answer such question is made a breach of the privileges of the body issuing the *subpœna*.

Another objection taken to this commitment, is, that the petitioner prayed to be heard by counsel in answer to the charge of contempt, and that this request was denied by the assembly. The assembly in refusing to hear the petitioner by counsel before adjudging him in contempt, might have acted arbitrarily and improper. Concede that it did, and yet it was a matter resting solely in the discretion of that body. And as the jurisdiction of the assembly, acting in this matter, was final, the court having no appellate power over it, it is not competent for us to revise the proceedings of the assembly, or suspend its judgment because it has made a mistake or abused its discretion in the premises. This point was most fully discussed and settled in the case of *Brass Crosby*, 3 Wil., 188, and

also in the case of *exparte Kearney*, 7 Wheat., 38, and it would be idle to attempt to fortify the reasoning there adopted.

Again it is insisted that there was no sufficient warrant o commitment made out and signed by the speaker of the assembly, setting forth clearly the cause of the commitment, and authorizing the sergeant-at-arms to keep the petitioner in close custody. The petitioner was in the custody of the sergeant at arms, and the assembly by a resolution ordered that he be continued in custody by its officers, for the term of ten days, as a punishment for the contempt of the petitioner, as adjudged by that body, in failing to appear before the joint investigating committee. Here the cause of the commitment is fully set forth in the resolution or judgment of the assembly; and is not the resolution as valid and sufficient to authorize the sergeant-at-arms to hold the petitioner in custody as would be a speaker's warrant? The respondent returns that it is by virtue of this resolution that he holds in custody the petitioner, and this, I think, is a good and sufficient return to the writ of *habeas corpus*. These observations entirely dispose of this case, but we were requested to state our views in regard to some provisions of the act of the legislature, approved February 3rd, 1858, which I will now proceed to do, in a brief manner.

It must be admitted that some of the provisions of this act are unusual, and wear a harsh and arbitrary aspect; but I do not think they are obnoxious to any constitutional objection. The second section of the act makes the neglect of a witness to appear before the committee, or his refusal to answer questions pertinent to the matter of inquiry, a contempt of the house whose process had been disobeyed. It is objected that the committee might ask a witness, called before it, if he had received a bribe, as a consideration for voting in a particular manner upon the disposition of the land grant, and that if the witness refused to answer the question, such refusal would be

deemed a contempt, and the witness punished accordingly; while if compelled to answer, such answer might tend to criminate himself, and thus the spirit, if not the letter, of that provision of the constitution would be violated, which says that no person shall be compelled in any criminal case, to be witness against himself. This objection is answered by a reference to the language of the 8th section of this act. This section, in substance, provides that no person examined and testifying before either house of the legislature, or a committee of either house, or a joint committee of the two houses, shall be held to answer criminally in any court of justice, or be subject to any penalty or forfeiture for any fact or act, touching which he shall be required to testify, &c. This language is most broad and comprehensive, and furnishes a full protection to a witness against a criminal prosecution in the courts of this State, for any offence he may have committed, and about which he might be called upon to testify. If the answer would tend to criminate, or expose the witness to a criminal prosecution in the court of another State, or in the courts of the United States, he might not be compelled to answer.

But again, it is said that although the answer might not expose the witness to a criminal prosecution or penalty, yet it might tend directly to degrade his character, and for this reason he ought not to be compelled to answer. In the courts of justice, witnesses are not excused from answering questions tending to disgrace them. The authorities upon the point are not uniform, but Prof. Greenleaf lays it down as the better opinion, that where the transaction as to which the witness is interrogated, forms any part of the issue to be tried, the witness will be obliged to give evidence, however strongly it may reflect on his character. 1 Greenl. Ev., section 454; *The People vs. Mather*, 4 Wend., 250, and cases there cited.

Considerations of State policy have led parliament to adopt a much wider latitude in the examination of witnesses, than

is permissible in courts of justice. And it is stated by Cushing in his law and practice of legislative assemblies, page 397, section 1001, that a witness before either house of parliament cannot excuse himself from answering any question pertinent to the matter of inquiry, on the ground that his answer would expose him to a criminal prosecution, or be the means of divulging the secrets of his clients, communicated to him in professional confidence. It would be very unwise to confine the legislature in its investigations to the same strict rules of evidence which prevail in courts of law. The very tranquility and existence of the State might require that the utmost latitude as to form and subject matter of the questions proposed be allowed, in order to expose and bring to light some wide spread conspiracy to overthrow the government, or some combination to paralyze its powers by corrupting the high public officers under the government.

The conclusion to which I have arrived upon the case is, that the petitioner must be remanded to the custody of the sergeant-at-arms.

Petitioner remanded accordingly.