In the Matter of the Petition of CONRADES, JR., for Writ of Habeas Corpus.

St. Louis Court of Appeals, March 29, 1904.

(Opinion by Goode, J.)

1. MUNICIPAL CORPORATIONS: Compelling the Production of Papers: Authority of Committee. A resolution passed by the House of Delegates of the city of St. Louis, reciting that the city had been deprived of its just revenue by a dodging of the payment of personal tax and authorizing the speaker to appoint a committee to investigate the books and papers of the several departments, with power to subpoena witnesses and send for persons and papers, was sufficient authority to the committeemen appointed to compel by *duces tecum* the secretary of a manufacturing corporation to produce its books and papers for the inspection of the committee.

2. ———: ———: Power of Municipal Assembly. Under section 31, article 3 of the charter of the city of St. Louis, the House of Delegates of that city has power to summon witnesses and compel the production of books and papers of private corporations in the investigation of reported evasions of merchants' and manufacturers' tax and to delegate such power to a committee.

3. ———: ———: Criminating Witness. The secretary of a private corporation, who has been arrested for contempt in refusing to produce the books and papers of his corporation for the inspection of a committee of the House of Delegates, of the city of St. Louis, appointed to investigate reported tax delinquencies, can not be released on a writ of habeas corpus in the court of appeals on the ground that his production of such documents would tend to criminate him, where he did not claim that privilege at the time he refused to produce them, and it did not appear that the evidence he was required to produce would have that tendency.

4. ——: ——: **Searches and Seizure.** The compelling of the production of books and papers of a private corporation by a municipal assembly for the purpose of investigating reported evasions of taxes, is not an unreasonable search and seizure within the meaning of the Constitution.

**(Dissenting Opinion by Bland, P. J.)**

5. ——: ——: **Authority of Committee.** A committee appointed in pursuance of a resolution of the House of Delegates of the city of St. Louis, to investigate tax dodging, possess no general or common law jurisdiction and is confined to the authority given by the resolution.

6. ——: ——: ——. Where the power directly given to the committee was to investigate the books and records of the several departments of the city, though the resolution recited the evasion of taxes and the necessity of investigation, and empowered the committee to subpoena witnesses and send for books and papers, the resolution was too narrow to authorize the committee to compel by *duces tecum* the production of books and papers of a private corporation.

7. ——: ——: **Criminating Evidence.** From the fact that the resoluton recited, as the reason for the investigation, the evasion of taxes, which would necessarily involve the making of false affidavits, etc., the secretary of a corporation subpoenaed before the committee could not be compelled to produce the books and papers of his corporation, on the ground that it would tend to furnish evidence upon which indictments might be found.

8. ——: ——: **Private Corporations.** The right of the State to inquire into, supervise and regulate semipublic corporations which render public service, does not apply to private corporations organized solely for the purpose of conducting a private business; the individual and property rights of the latter corporation are entitled to the same protection as the individual and property rights of natural persons.

Original Proceeding.

Certified to Supreme Court.

*W. E. Fisse* and *T. N. Judson* for petitioner.

*Peter T. Barrett* and *T. P. Bashaw* for respondent.

GOODE, J.—The decision of this matter arises on the return of John H. Strobel, sergeant at arms of the House of Delegates of the city of St. Louis, to the writ

issued commanding him to produce the body of the prisoner.     The petitioner moved for his discharge on the facts stated in the return.

From the return, as well as from the charter of the city, it appears that the House of Delegates is one branch of the Municipal Assembly of the city of St. Louis.     Said  Municipal Assembly is authorized by the charter to assess, levy and collect all taxes for general purposes on real and personal property and to license various  business pursuits,  including  merchants and manufacturing concerns and to fix the rate of taxation and the amount to be paid for licenses.     Pursuant to said charter powers, the Municipal Assembly passed an ordinance by which merchants before offering to do business as such, must procure a license from the License Commissioner, and as the basis for such license must furnish to said commissioner:

"First: A statement of the value of the just amount of all goods, wares and merchandise which he may have had in his possession or under his control at that time between the first Monday of March and the first Monday of June each year.

"Second: A statement of the aggregate amount of sales made by him during the year, and each statement shall be made in writing and delivered to the License Commissioner, verified by the affidavits of the merchants or officers of the corporation making it, if residing in the city, if not, then by some creditable person duly authorized to do so and the amount of taxes and license due thereon shall be paid to the collector at his office on or before the first Monday in July of each year."

Manufacturers are required to furnish the License Commissioner as the basis of their licenses:

"First: A  statement of the aggregate raw material, merchandise and finished products ( to be listed separately) which he had on hand between the first Monday of March and the first Monday in June of each year on any one day between said times, as well as all tools,

machinery and appliances used in conducting his business or owned by him on the first day of June in each year.

"Second: A statement of the aggregate amount of all sales made by him during the year next preceding the first Monday in June, which statement shall be made in writing and delivered to the License Commissioner, verified by the affidavit of the manufacturer or other officer of the corporation making it, if he is residing in the city, if not, then by some creditable person authorized to do so, and the amount of taxes thereon shall be paid to the License Commissioner at his office on or before the first Monday in July of each year."

The commissioner is required to keep a list of persons and corporations who must pay a license tax and collect all information for the proper assessing, levying and issuing of licenses and license taxes. The ordinances provide also for the establishment of a board of license revision, consisting of three real estate owners to adjust and correct licenses and license taxes and the license taxbooks of the city.

By section 31, article 3, of the charter of the city of St. Louis, it is provided as follows:

"The assembly, or either house, shall have power to compel the attendance of witnesses, and the production of papers relating to any subject under consideration, and in which the interests of the city are involved, and shall have power to call upon any proper officer of the city of St. Louis to execute such process. The President of the Council and Speaker of the house, and the chairman of any committee of either house, shall have authority to administer oaths to witnesses."

By virtue of that charter power, the Municipal Assembly enacted an ordinance providing that whenever either of its houses, shall, by resolution, authorize a committee to make an investigation of any question or matter on which such house may lawfully take action, and shall empower such committee to send for persons and

In re Conrades.

papers, the committee shall, thereupon, have authority to issue subpoenas and subpoenas *duces tecum,* signed by the presiding officer of such committee and attested by the clerk of the house; such writs to be served by the sergeant at arms.

On October 30, 1903, the House of Delegates adopted the following resolution:

"Whereas, it is generally claimed in public and private that the city of St. Louis is being systematically robbed of its just resources in the way of personal and other taxes, and,

"Whereas, the city much needs, at the present time, her just dues in order to properly meet the extra demands being made upon her in these days of commemorations and celebrations and that each citizen may do his part, and that the tax-dodger and schemer may be compelled to pay their full share, and that the dishonest be brought under the searchlight:

"*THEREFORE,* Be It Resolved, That the speaker be empowered to appoint a special committee of five members of this house (the first named being chairman) to fully and carefully investigate the books, records and accounts in the several departments wherein returns are made of taxes, either personal, real or upon ad valorem basis, in relation to merchants' and manufacturers' license or personal tax, and that such committee be empowered to subpoena witnesses and to send for persons and papers and to administer oaths, and if necessary to empower one or more attorneys, whose compensation shall not exceed $350 per month, each; a clerk, who shall be an expert accountant and bookkeeper and perform such duties as the committee may elect, whose compensation shall not exceed $200 per month, to aid in the discharge of their duties and report their findings and recommendations as soon as possible."

The speaker of the House of Delegates appointed a committee of five members to conduct the investigation. In the course of its investigation said committee issued

a subpoena *duces tecum* to the petitioner J. H. Conrades, Jr., secretary of the J. H. Conrades Chair Company, commanding him to appear before the committee February 14, 1904, then and there to testify concerning a certain matter, and bring with him the sales books, cash books, general ledgers and recapitulation books of said chair company, showing the sales from June 1, 1902, to June 1, 1903, and the balance sheet for said period. This subpoena was served, and in obedience to it the petitioner appeared before said committee and asked to be excused to February 25, 1904. On the latter date he appeared before the committee and refused to produce the books ordered, though he admitted they were in his possession, planting his refusal on the ground that neither the committee nor the House of Delegates had a right to compel him to produce the books.

Ordinances of the city provide that in such cases the committee subpoenaing the witnesses shall report the facts to the house and that upon the coming in of the report the presiding officer of the House of Delegates, if directed by it, shall issue a warrant to the sergeant at arms commanding him to arrest the accused witness and have him before the house to answer for contempt, and further providing that if, on the hearing of the matter, the House of Delegates adjudges the witness to be in contempt of its authority, it may, for the first offense, punish him by a fine of not more than one hundred dollars, or by imprisonment in the city jail for not more than ten days, or by both such fine and imprisonment.

The sergeant at arms was unable to find Conrades on the first warrant and made return to that effect; whereupon the house issued an alias warrant of the same tenor, under which the petitioner was arrested and while in the custody of the sergeant at arms, sued out this writ of habeas corpus. It further appears that said Conrades Chair Company is a corporation with its chief office in the city of St. Louis and that it has been doing a business there which is subject to a license tax.

Three reasons have been given why the petitioner ought to be discharged from custody: First, that the committee acted outside the powers conferred on it by the resolution of the House of Delegates in undertaking to compel the petitioner to produce the papers and books of the Conrades Company. The essential purpose of that resolution, leaving out of view certain high-flown phrases contained in it, was to provide for a careful investigation of the books, records and accounts in the several departments of the city wherein returns are made of property for taxes and books and documents kept relating to merchants' and manufacturers' licenses and personal taxes and to get a report from the committee of their findings and recommendations. The cause of the appointment of the committee was declared to be current reports that the city was deprived of its just resources in the way of personal and other taxes, which likens this case to People ex rel. McDonald v. Keeler, 99 N. Y. 463, infra. Giving a fair interpretation to the resolution, the intention of the house was to have the matter of the assessment and collection of personal and license taxes investigated with a view to adopting legislative measures to secure more satisfactory results in collecting the revenues of the city. This plainly appears from the conclusion of the resolution, which directed the committee to report its findings and recommendations as soon as possible. The resolution expressly conferred on the committee the power to subpoena persons, send for papers and administer oaths. We must presume that this proceeding on the part of the House of Delegates and the acts of the committee in calling for the books of the Conrades Chair Company were in good faith and for the purpose of acquiring information which would enable the House of Delegates to proceed in an intelligent way to devise more effectual measures for raising the necessary revenue for the city. Construing the preamble and resolution together, it is plain that calling for the books in

question came within the spirit of the duty consigned to the committee to see whether proper returns had been made by merchants and manufacturers of their property for taxation, and, if not, how the mischief could be corrected. It, therefore, became necessary for the committee to investigate such returns as were on file in the proper departments of the city government and might very well become necessary to take the evidence of extraneous witnesses and documents. The action of the committee in issuing a subpoena *duces tecum* was within the scope of the power conferred on it by the resolution. The House of Delegates plainly thought the committee had not transcended its powers, for it upheld its action when the petitioner was reported by the committee to be in contempt of its process.

In Burnham v. Morrissey, 14 Gray 226, the petitioner prayed to be discharged from the custody of the Sergeant at Arms of the Commonwealth of Massachusetts, he being held under a warrant of the Speaker of the House of Representatives of that State. The House of Representatives of the Massachusetts Legislature had appointed a special committee to investigate the affairs of the State Liquor Agency with authority to send for persons and papers. That committee issued a subpoena to Burnham, commanding him to produce before the committee all the books and papers relating to the liquor commission. He refused to produce some of them, was arrested, arraigned before the bar of the House of Representatives, interrogated concerning his refusal and answered denying the right of the committee to compel the production. The Supreme Court of Massachusetts remanded him to jail, holding that he was lawfully in custody. This case will be referred to again.

The second ground of release asserted by the petitioner is that the investigation undertaken by the committee of the House of Delegates, by virtue of which it sought to compel the production of the books of the Conrades Company, was not related to any function or duty

of the house, and, therefore, it had no power to compel the attendance of witnesses or the production of papers. Section 31, article 3, of the charter of the city of St. Louis, which has been quoted above, provides in express terms that either house of the Municipal Assembly shall have the power to compel the attendance of witnesses and the production of papers in any matter in which the interests of the city of St. Louis are involved. What greater interest could the city of St. Louis have than the proper collection of the revenues which are indispensable to the performance of its functions and its existence as an efficient body politic? Every function which the city has to discharge, every duty which pertains to it, depends more intimately on the revenues of the city and their prompt and satisfactory collection than on anything else. The Municipal Assembly is empowered to levy and collect taxes on personal property and from merchants and manufacturers. It is, of course, the duty of the assembly in carrying out that charter power, to provide proper ordinances and regulations for assessing and collecting the revenues. The revenues for merchants and manufacturers are collected on an ad valorem basis, dependent on the highest amount of goods, wares and merchandise, raw material and finished products carried by such concerns during the year. To legislate on this matter intelligently and devise from time to time practical expedients for the just assessment and collection of taxes, the Municipal Assembly and its two houses must collect information and advise themselves as to all relevant facts. To do this it is obvious that they may need the evidence of witnesses and books and papers, and the houses have as much right to procure such evidence as a court has to take testimony in hearing a case. Just what practical result this investigation will lead to if not obstructed, or whether it will lead to any, cannot be known. It may prove wholly abortive and may result in salutary measures which will greatly redound to the advantage of the city and its institutions. But whatever

the result, this court has no right to interfere with the action of the House of Delegates unless it has transcended its legal prerogatives. Of course, it cannot vex citizens by summoning them as witnesses and compelling them to produce private books and papers in pursuance of an investigation about matters it has no control over, and no power to legislate about. But this investigation relates to its supreme and most essential duty. We are told that the collection of the revenue rests with the State and with the License Commissioner. The License Commissioner has his duty to perform in respect to the licenses of manufacturers, merchants and persons engaged in other pursuits, and the State statutes largely regulate the collection of the revenues. But the Municipal Assembly of the city has duties in that connection too, by virtue of the city charter, which empowers it to collect all taxes for general purposes on real and personal property and to license various vocations and empowers it likewise to fix the rate of taxation within the limits of the State Constitution and State legislation. It is obvious that in the matter of fixing the rate of taxation and the amount of license tax to be charged, the Municipal Assembly needs information. If insufficient revenues are raised at any given time under the measures then in force, that fact might be due to the rate of taxation being too low, or to assessments being too low, or to inefficiency in collecting the taxes. Just what step should be taken to meet a deficiency of revenue would depend, therefore, on the cause of the deficiency. It might be necessary to levy taxes at a higher rate, or to enforce, by some method, a more rigid collection of the revenue. Cities do those things constantly and regularly. They often engage attorneys and adopt extraordinary measures to collect their delinquent revenues. It seems to us that it is not only proper, but absolutely necessary that the Municipal Assembly of St. Louis shall have power to investigate the facts bearing on such important questions, with which it has much to do and to obtain evidence

from whatever source it may. All legislative bodies have this power. An eminent writer on constitutional law speaks of it in this language:

"Each house must be allowed to proceed in its own way in the collection of such information as may seem important to a proper discharge of its functions, and whenever it is deemed desirable that witnesses should be examined, the power and authority to do so is very properly referred to a committee, with any such powers, short of final legislative or judicial action, as may seem necessary or expedient in the particular case. Such committee has no authority to sit during a recess of the house which has appointed it, without its permission to that effect, but the house is at liberty to confer such authority if it sees fit. A refusal to appear or to testify before such committee or to produce books and papers, would be a contempt of the house; but the committee cannot punish for contempts; it can only report the conduct of the offending party to the house for its action. The power of the committee will terminate with the final dissolution of the house appointing it." Cooley, Const. Law (7 Ed.), p. 193.

The Massachusetts case above referred to is a leading one on this subject and on the power of legislative bodies to commit witnesses for disobedience of their orders to produce books and papers or refusing to answer questions. We quote from the opinion, which was based on facts very similar to those before us.

"The House of Representatives has many duties to perform which necessarily require it to receive evidence and examine witnesses. It is the grand inquest for the Commonwealth, and as such has power to inquire into the official conduct of all officers of the Commonwealth, in order to impeachment. It may inquire into the doings of corporations, which are subject to the control of the Legislature, with a view to modify or repeal their charters. It is the judge of the election and qualification of its members. It has power to decide upon the expulsion

of its members. It has often occasion to require a certain knowledge of facts, in order to the proper performance of legislative duties.

"We therefore think it is clear that it has the constitutional right to take evidence, to summon witnesses, and to compel them to attend and to testify. This power to summon and examine witnesses it may exercise by means of committees. If a witness, duly notified or summoned, by the authority of the house, to attend before a committee or before the house, refuses to attend, or, when present and required to testify or to do any other act which a witness may be lawfully required to do, refuses to obey the lawful commands of the house in that behalf, it is a contempt of the authority of the house, and, upon such refusal to attend or if such refusal to testify occur before a committee, the house may compel his obedience by arresting him by the proper officer of the house, and bringing him before the house.

"If, when before the house, he is contumacious and refuses to obey, without lawful excuse, such conduct renders him 'guilty of disrespect to the house by contemptuous behavior in its presence,' within the meaning of the tenth article of chapter 1, section 3, of the Constitution, and he may be lawfully imprisoned for such contemptuous behavior, for a term not exceeding thirty days. Wilful disobedience to the commands of the house, without sufficient excuse or justification, in its presence, is such contemptuous behavior as the Constitution contemplates.

"In the case before us, the petitioner was present before a committee of the house, which was charged by its authority with a lawful inquiry, and empowered to send for persons and papers. He was called on to testify, and to produce certain books which were pertinent to the inquiry before the committee. No summons was necessary, because he was voluntarily present. He refused to produce the papers; and when brought before the house to answer for this disobedience, his only excuse or justi-

fication was that the papers were private. We know of no rule of law, which exempts any person from producing papers, material to any inquiry in the course of justice, merely because they are private."

The New York Court of Appeals dealt with the same question in People ex rel. McDonald v. Keeler, 99 N. Y. 463. The petitioner had been committed for contempt of the Senate of the State of New York under a warrant issued by the president and clerk of the Senate and sued out a writ of habeas corpus. The Senate had appointed a committee to investigate the department of public works of the city of New York with power to send for persons and papers. They had subpoenaed McDonald as a witness and he declined to answer certain questions. He was brought before the bar of the Senate to answer why he should not be adjudged in contempt. He replied that he would appear before the committee and answer all material questions if allowed the advice and assistance of counsel. Thereupon the Senate adjudged him in contempt and ordered him imprisoned until the Legislature adjourned. The statutes of the State gave each house of the General Assembly power to punish as a contempt the refusal of a person to be examined as a witness before a house or committee in connection with legislative proceedings. The question was as to the validity of that statute and the case was distinguished from Kilbourn v. Thompson, 103 U. S. 168, in which the Supreme Court of the United States denied, in some measure, to Congress the power to imprison for contempt. The basis of the distinction was that Congress was a body of limited powers, having none but those delegated to it by the Federal Constitution, while the Legislature of New York had all the powers not withheld from it by the State Constitution; and it was ruled there was no State constitutional provision inhibiting the enactment of the statute. The opinion further says that, notwithstanding the general division of the powers of government into executive, legislative and judicial branches, the legislative body

has to exercise certain functions which are in their nature judicial. The opinion proceeds as follows:

"The power of obtaining information for the purpose of framing laws to meet supposed or apprehended evils, is one which has from time immemorial been deemed necessary and has been exercised by legislative bodies. In this State it does not rest upon precedent merely, but is expressly conferred by statute (1 R. S. 158, sections 1, 2), which provides that every chairman of a committee, either of the senate or assembly, or of any joint committee, is authorized to administer oaths to witnesses, and when the committee is, by the terms of the resolution appointing it, authorized to send for persons and papers, the chairman has the power, under the direction of the committee, to issue compulsory process for the attendance of any witness within the State whom the committee may wish to examine, and to issue commissions for the examination of witnesses out of the State. To subject a witness to punishment as for a contempt the testimony sought, as has already been shown, must relate to a legislative proceeding. (1 R. S. 154, section 13, subd. 4.)

"It is difficult to conceive any constitutional objection which can be raised to the provision authorizing legislative committees to take testimony and to summon witnesses. In many cases, it may be indispensable to intelligent and effectual legislation to ascertain the facts which are claimed to give rise to the necessity for such legislation, and the remedy required, and irrespective of the question whether in the absence of a statute to that effect either house would have the power to imprison a recusant witness, I cannot yield to the claim that a statute authorizing it to enforce its process in that manner is in excess of legislative power. To await the slow process of indictment and prosecution for a misdemeanor, might prove quite ineffectual, and necessary legislation might be obstructed and perhaps defeated, if the legislative body had no right to obtain the required information. That the power may be abused, is no ground for

denying its existence. It is a limited power, and should be kept within its proper bounds; and when these are exceeded, a jurisdictional question is presented which is cognizable in the courts. My conclusion is that subdivision 4 of section 13, 1 Revised Statutes, is constitutional and valid. These views are supported by the decision of this court in Wilckens v. Willett (1 Keyes 521, 525), where it was held that the House of Representatives of the United States had the power to compel the attendance of witnesses. In that case the court said, per JOHNSON, J.: 'That the power exists, admits of no doubt whatever. It is a necessary incident of the sovereign power of making laws, and its exercise is often indispensable to the great end of enlightened, judicious and wholesome legislation. The power is rather judicial in its nature; but in a legislative body it exists as an auxiliary to the legislative power only.' The power to punish for disobedience and contempt in refusing to attend is a necessary incident to the power to require and compel attendance."

That opinion is instructive on the further question of the connection of the matter to be investigated with the duties of the New York assembly. The committee was appointed to investigate the department of public works of the city of New York for the purpose of satisfying the taxpayers of the State as to the truth of rumors and charges that there were frauds and irregularities in the conduct of that department. The court held that an investigation instituted merely for curiosity or purely for political purposes not connected with intended legislation, but to reflect on or vindicate an individual would not be permitted; but that such investigations generally contemplate legislative action and that if frauds and irregularities had occurred in the administration of the department of public works of the city of New York, some suitable legislation might be provided to correct the mischief and the committee could recommend

suitable legislation for that purpose. The opinion con-
cludes:

"We are bound to presume that the action of the leg-
islative body was with a legitimate object, if it is capable
of being so construed, and we have no right to assume
that the contrary was intended. The same principle
which renders it the duty of courts to hold legislative ac-
tion illegal when it unduly encroaches upon the pro-
vince of the judiciary forbids interference by the latter
with the action of the legislative bodies or the exercise of
their discretion in matters within the range of their con-
stitutional powers."

It has already been pointed out above why an inves-
tigation of the kind undertaken by the House of Dele-
gates of the city of St. Louis might be necessary and use-
ful in suggesting some practical method for increasing
the city's revenues, either by raising the rate of taxation
or the assessment of property or leading to more effective
measures for collecting the revenues.

A case very similar to the foregoing is In re Falvey,
and Kilbourn v. Massing, 7 Wis. 630, wherein the peti-
tioner for a writ of habeas corpus was restrained of his
liberty pursuant to an order of the Wisconsin Legisla-
ture for refusing to answer questions propounded to him
by a committee appointed by said Legislature.

Lowe v. Summers, 69 Mo. App. 637, is a case where-
in the petitioner asked the Kansas City Court of Appeals
to discharge him on writ of habeas corpus from the
custody of the Sergeant at Arms of the House of Repre-
sentatives of this State. That house had appointed a
committee to investigate the Metropolitan Police System
of Kansas City on account of there being grave charges
against it. The committee was to report its findings
with recommendations of any modifications of the law
they might deem necessary. It summoned Lowe to test-
ify before it, but he refused to answer questions. The
opinion reviews the authorities we have cited and then
proceeds to lay stress on the fact that the resolution ap-

pointing the committee called for recommendations concerning the law. It held there was nothing in the resolution to show the investigation was for political purposes or was not connected with legislation, or was designed to reflect on any person, but that it appeared to be reasonable and lawful. It was further held that the committee, in the course of the investigation, was empowered to summon witnesses and take testimony and that the petitioner was in contempt of the house in refusing to answer questions.

Still more analogous to the present case is In re Dunn, 9 Mo. App. 255. That petitioner was committed to jail for refusing to pay a fine imposed by the House of Delegates of the city of St. Louis because he refused to obey a subpoena *duces tecum* from a committee which had been appointed by that house to inquire into the prosecution of the suit of the city of St. Louis versus the Laclede and St. Louis Gas Companies. Dunn was in the employ of the receiver of the St. Louis Gas Light Company and was commanded to produce a book of that company known as the "lamp book" which he had in his possession. He refused to produce it and was held to be in contempt of the house, fined, and committed to jail for not paying the fine. The opinion in that case cites the various charter powers of the Municipal Assembly of the city of St. Louis bearing on the question at issue and reviews the constitutional privileges of witnesses. The prisoner was remanded. Among other things the opinion says:

"In our form of government, the legislative, executive and judicial departments are carefully separated from each other and constitutional provisions are ample to prevent any encroachment by one of them upon the province of another. But it is nevertheless a recognized necessity that one department must, in many cases, in order properly to discharge its own duties, exercise the same sort of functions that are devolved generally upon a different branch of the government. Thus, the Legis-

lature cannot possibly perform its whole duty to the public without sometimes doing acts of a judicial natrue. It must investigate and decide upon facts. It cannot do this with effect without the power to examine witnesses and to compel their attendance. In all such matters a municipal Législature differs in nothing from any other, except in so far as its powers are defined by the charter of its creation. This charter, again, must be construed in subordination to the Constitution of the State."

The foregoing authorities make it clear that the House of Delegates of the city of St. Louis has power to summon witnesses and compel the production of books and papers in the investigation of any matter connected with its duties and functions and to delegate the investigation to a committee which may summon witnesses and cause the production of books. Indeed there is positive statutory authority to do so. The fact is clear, too, we think, that the matter referred to the committee which summoned the petitioner cannot be held to have been a usurpation of authority or inconsistent with the duties of the House of Delegates without dangerously encroaching on the rights and prerogatives of that legislative body. All officials or official bodies are entitled to the presumption of performance in good faith of their duties until the contrary is made to appear, and courts should be careful about hampering other departments of government in their attempts to do their duty. They should do so only under the plain warrant of a statutory or constitutional provision. Nothing appears from the return in this case tending to show that the House of Delegates is engaged in this investigation from an idle or curious motive, or without a purpose to serve the city by some appropriate step based on the information that may be collected in the course of the investigation.

Thirdly, it is said the evidence would tend to criminate the prisoner or the officers of the corporation he

serves, and therefore is privileged. No privilege on that ground was claimed by the prisoner. He does not say, nor was it shown he had any connection with the Conrades Company's return of its property for taxation, or that he would be furnishing evidence against himself or any one else. A witness is allowed to judge whether the evidence he is asked to give will criminate him and refuse to answer, if, in his judgment, it will. The same is true as to the production of books and papers; for no person can be compelled to furnish evidence of that character which will tend to fasten a criminal charge on him. But the privilege must be asserted and in this case it has not been. Of course, if it was palpable that the evidence Conrades was asked to produce would tend to criminate him, he might be protected without making the claim of privilege. But what is there in the return to show this? For aught we know, the books and papers might vindicate him and all concerned. On that point the Supreme Court of Massachusetts in the Burnham case said:

"No man is obliged to testify or to furnish evidence to criminate himself; but the petitioner did not place his refusal upon this ground. He was not a defendant charged with any crime. He expressly refused to express or form an opinion whether the production of the books would criminate him. The duty of the committee, as appears by the record of the house, was that of general investigation merely. If the entries in the books which he was asked to produce, which were material to the subject of investigation, were shown to be mingled with others, not relating to the matters inquired of, which were private in their nature, such parts only as were relevant might have been exhibited, and the other protected from exposure."

State ex rel. Att'y-Gen. v. Simmons Hardware Co., 109 Mo. 118, is wholly unlike this matter, for there the proceeding was to forfeit the charter of the defendant because it had refused to answer whether it had violated

a penal statute of the State; a question that called for an answer necessarily criminating, if in the affirmative.

But this case is even more extreme. Not only did the prisoner make no claim of privilege before the House of Delegates and its committee, either for himself or his company, but instead of appearing to purge himself of the alleged contempt, he sued out this writ. It should be remembered that the prisoner has never been either fined or ordered imprisoned. In fact, has never been adjudged in contempt of the House of Delegates. Two writs were issued to the sergeant at arms commanding him to arrest the petitioner and produce him before the house to answer for contempt in refusing to produce the books of the Conrades Company. He was arrested on the second writ and instead of making an answer to purge himself of his contempt, or asserting a claim of privilege based on the contention that the evidence he was called on to give would tend to criminate him or forfeit some right of his company, he has appealed to this court for a discharge. What right have we to say that the House of Delegates would not recognize his privilege if asserted there? Surely that body is entitled in the first instance to pass on the question, and it was incumbent on this petitioner to present his claim of privilege to it before demanding relief from the court.

We have found no case in which such a claim was recognized by the court when not previously asserted in some form by the petitioner, unless it was palpable the evidence sought would be criminating. In every instance when relief was asked the legislative body had proceeded to inflict a punishment for contempt except the Lowe case. But we are called on to discharge this prisoner when he has not even made his claim to the House of Delegates. What the petitioner asserts is that the house or committee had no right to call for the books in question, not because they would tend to criminate anybody or bring down punishment on the corporation itself, but, as stated in the return, on the ground that

neither the committee nor the house had the right to compel him to bring the books for their inspection.

In the Lowe case, supra, the Kansas City Court of Appeals held that Lowe was guilty of a second contempt in refusing to appear and show cause why he should not be punished for contempt. The opinion said: "At all events when summoned it was his duty to appear before the bar of the house, answer the alleged contempt and show cause why he had refused to testify."

It is palpable that Conrades, out of respect to the House of Delegates, is bound to appear there and claim his privilege on the ground of criminating testimony, to make that point available here. If it had been asserted we must assume that it would have been respected, as it ought to be. In the absence of such claim, or anything to show the books and papers called for would have a criminating effect, and in view of the statute giving the House of Delegates power to call for books and papers, we cannot excuse the petitioner from complying with the subpoena on a bare conjecture that the evidence sought might criminate him or draw down punishment on the corporation or its officers. No violation of the guaranty against searches and seizures has been urged. That constitutional provision relates to searches and seizures in houses and among private papers under general and indefinite warrants and writs of assistance. Cooley, Const. Lim. (7 Ed.), p. 424, et seq.; Story, Const. (5 Ed.), sec. 1901. Compelling the production of books and papers for purposes of evidence is no unreasonable search or seizure, provided the subpoena for their production be precise and definite as to the documents necessary as evidence. People v. Rector, 6 Abb. Pr. 176; Morrison v. Sturgis, 26 How. Pr. 177; Bank v. Dunham, 13 How. Prac. 541; Ex Parte Brown, 72 Mo. 83. Of course if the document would tend to criminate the producer, he could claim his privilege.

In City of St. Joseph v. Levin, 128 Mo. 588, it was said concerning the constitutional provision in question,

in connection with a city ordinance requiring pawnbrokers to keep a book of their dealings to be open to the inspection of the mayor or any police officer on demand:

"The ordinance is a mere police regulation which the city, by virtue of its charter powers, had the right to pass, to aid in the prevention and detection of larcenies of personal property which is frequently sold or pledged to pawnbrokers by thieves, and not for the purpose of preserving evidence to be used against any other person. The defendant was not charged with any crime, nor was there any pretense that he was guilty of crime, and because of the fact that the book might tend to show that he was in the possession of property which had been stolen; that he might possibly be prosecuted at some future time for receiving it, knowing that it had been stolen, and the information acquired by the police officer from an inspection thereof used against him, was no reason why he should not have complied with the ordinance, and submitted the book to the inspection of the police officer. In a criminal proceeding against the defendant, he could not of course be required to produce the book to be used as evidence against him, or to permit an examination of it for that purpose, because to do so would be an invasion of his constitutional right. In this case, however, no right guaranteed to him by the Constitution is violated by the ordinance."

The petitioner is remanded to the custody of the sergeant at arms of the House of Delegates. *Reyburn, J.,* concurs, *Bland, P. J.,* dissents, and for the reason that in his opinion the views of the majority of the court are opposed to State v. Metzger, 45 Mo. 65; State v. Young, 119 Mo. 585, 24 S. W. 1038, and the other cases decided by the Supreme Court and by this court cited in his separate opinion he asks that the cause be certified to the Supreme Court for final adjudication. It is, therefore, ordered that this cause be certified to the Supreme Court for its decision.

DISSENTING OPINION BY BLAND, P. J.

On October 30, 1902, the House of Delegates and Municipal Assembly, of the city of St. Louis, passed the following resolution:

"Whereas it is generally claimed in public and private that the city of St. Louis is being systematically robbed of its just resources in the way of personal and other taxes and whereas, the city much needs, at the present time, her just dues in order to properly meet the extra demands being made upon her in these days of commemorations and celebrations and that each citizen may do his part, and that the tax-dodger and schemer may be compelled to pay their full share, and that the dishonest be brought under the searchlight:

"*Therefore,* Be It Resolved, That the Speaker be empowered to appoint a special committee of five members of this house (the first named being chairman), to fully and carefully investigate the books, records and accounts in the several departments wherein returns are made of taxes, either personal, real or upon ad valorem basis, in relation to merchants' and manufacturers' license or personal tax, and that such committee be empowered to subpoena witnesses and to send for persons and papers and to administer oaths, and if necessary to employ one or more attorneys, whose compensation shall not exceed $350 per month each; a clerk who shall be an expert accountant and bookkeeper and perform such duties as the committee may elect, whose compensation shall not exceed $200 per month, to aid in the discharge of their duties and report their findings and recommendations as soon as possible."

The special committee of five provided for were duly appointed by the speaker of the house and proceeded to make an investigation of the returns made to the assessor by the taxpayers of the city.

The petitioner is the secretary of the J. H. Conrades Chair Company, a corporation organized under the laws

of this State and doing business in the city of St. Louis. The committee, on February 15th, issued a subpoena *duces tecum* to J. H. Conrades, Jr., secretary, etc., commanding him to appear before the committee at the hall of the House of Delegates, in the city of St. Louis, on February 24, 1904, at 2:30 P. M., then and there to testify, "and to bring with him the sales books, cash books, general legers, recapitulation books of the said J. H. Conrades Chair Company, showing the sales from June 1, 1902, to June 1, 1903, and the balance sheet for said period of said J. H. Conrades Chair Company." The subpoena was duly served upon the petitioner. He refused to produce the books and papers called for by the subpoena. His refusal was reported by the committee to the house, whereupon the house issued a warrant for his arrest and for him to be brought before the house to answer for contempt. The sergeant at arms of the house arrested the petitioner on this warrant and holds him in custody by virtue thereof. To regain his liberty, he sued out of this court a writ of habeas corpus.

The return of the sergeant at arms of the house to the writ sets forth with great particularity the proceedings of the house and of the committee resulting in the arrest and detention of the petitioner, and the several clauses of the city's charter and ordinances showing authority for each step taken, and we think the return is sufficient to show that the petitioner is justly restrained of his liberty, if the committee had authority to compel the production of the books and papers mentioned in the subpoena. The authority conferred on the committee is "to fully and carefully investigate the books, records and accounts in the several departments wherein returns are made of taxes, either personal, real or upon ad valorem basis, in relation to merchants' and manufacturers' licenses and personal tax." The books, etc., which the committee are by the resolution authorized to investigate, are the books, records and accounts of the several departments of the city government wherein returns are

made for taxes, not the books, papers and accounts of private persons or business corporations kept in their private offices. The committee is a special tribunal possessing no general or common law jurisdiction and is, therefore, as to the subject-matter of its jurisdiction, confined strictly to the authority given it by the resolution. State v. Metzger, 45 Mo. 65; Townsend v. Hawkins, 45 Mo. 287; Gibson v. Vaughan, 61 Mo. 418; Rohland v. Railway, 89 Mo. l. c. 182, 1 S. W. 147; Ex Parte O'Brien, 127 Mo. l. c. 488, 30 S. W. 158; Sutton v. Cole, 155 Mo. l. c. 213, 55 S. W. 1052; State v. Schneider, 47 Mo. App. 669; Hardware Co. v. Riddle, 84 Mo. App. 275; 17 Am. & Eng. Ency. of Law, 1084. The house being without general authority to commit for contempt and the resolution being too narrow to include the investigation attempted (Kilbourn v. Thompson, 103 U. S. l. c. 190), we might stop here and order the discharge of the petitioner, and would do so, but for the fact that the House of Delegates, through its counsel, has strenuously urged on us a liberal interpretation of the resolution; that we should construe the resolution in the light of the preamble and of the power conferred on the committee to send for books and papers and examine witnesses. If we should do this and read into the resolution the power to send for the books and papers of private business corporations and to examine their officers under oath, then we have this state of case to consider: A preamble indicting . . . persons and corporations on general rumor with having made affidavits to false statements to the assessor of their taxable property which under the statute is perjury (sec. 9150, R. S. 1899), and a commission to the committee to find out by an examination of the officers of private corporations and their account books and papers which of them within the city of St. Louis has, by and through its officers, made false returns to the assessor; and in like manner to find out who and how many of the individual taxpayers of the city have committed the like offense in like manner, and report to

the house any and all delinquents that their names may be written into the blank space in the indictment. It is true the house has no power to prefer an indictment against any one, but the evidence it seeks to obtain, if allowed to proceed through its committee with this character of investigation, might furnish to the grand jury ample grounds upon which to predicate indictments. It might also and doubtless would, have the effect to greatly mitigate the evil set forth in the preamble to the resolution.

The subject of equitable taxation has received the earnest consideration of many eminent economists and a variety of expedients have been devised by legislative bodies to bring it about with a view to relieve the rich of the "burden of dodging taxes," and to equalize taxation among all taxpaying citizens. But the rich continue to carry their "burden of dodging taxes" and the man of moderate means still bears his burden of unequal taxation. The scheme, the counsel for the house contends is embraced in the resolution, if extended throughout the State, would have the effect to greatly equalize taxation. But our government is one of the restricted powers. Certain inalienable rights are guaranteed to the citizens (including private corporations) which the courts are bound to protect whenever attacked from any quarter. Among these rights is this one, " that no person shall be compelled to testify against himself in a criminal case." (Section 23, Missouri Bill of Rights.) Construing this clause of the Bill of Rights, we said in In re Charles Green, 86 Mo. App. l. c. 220:

"In State ex rel. v. Simmons Hardware Company, 109 Mo. 118, it was ruled, that 'if the proceeding is criminal in its nature, that is, if he is charged with having committed a crime, then it is clear that he can not be compelled to testify against himself, and this is so whether the proceeding is criminal in form or is as to form a civil proceeding;' and in the same case it is further said, 'the Constitution provides that no person shall

be compelled to testify against himself in a criminal case, prohibits an individual from being compelled to furnish a link in a chain of evidence by which his conviction of a criminal offense may be secured.'

"In Counselman v. Hitchcock, 142 U. S. 547, it was ruled, that 'a witness could not be compelled to disclose the circumstances of his offense, the source from which, or the means by which, evidence if its commission, or his connection with it, may be obtained, or made effectual for his conviction.'

"Greenleaf in his work on Evidence states the rule thus: 'When the answer will have a tendency to expose the witness to a penal liability, or to any kind of punishment, or to a criminal charge, the witness is not bound to answer,' (vol. 1, sec. 451) approvingly cited in State v. Talbot, 73 Mo. 357.

"The provision of the Constitution quoted in the Simmons Hardware case is for the protection of personal liberty and has always received a liberal construction at the hands of both the Federal and State courts. And these courts have invariably—when brought before them—held as unconstitutional, statutes passed in aid of the inforcement of revenue laws, election laws, the interstate commerce law, laws against the formation of pools and the like, which require a person to purge his conscience of a violation of them, when to do so he would be compelled to furnish evidence which might lead to his conviction of a crime. State ex rel. v. Simmons Hardware Company, supra; Counselman v. Hitchcock, supra; Boyd v. U. S., 11 U. S. 616; Ex parte Senior, 32 L. R. A. 172. As is said in State v. Young, 119 Mo. loc. cit. 520, 24 S. W. 1038, 'the Constitution is broad enough to protect the defendant against self-conviction before any tribunal in any proceeding.' "

As the petitioner did not claim that the production of the books, etc., called for would tend to criminate him or the corporation or any of its officers, it is claimed he

ought not be discharged. By the preamble and the action of the committee in serving upon him the subpoena to produce the books and papers, the corporation and its officers were tentatively accused of the crime of making a false return of its property for the purpose of taxation. In these circumstances no officer representing the corporation can be called upon to produce evidence against himself. He is in the attitude of defendant in a criminal case and may refuse to be sworn as a witness. In re Charles Green, 86 Mo. App. 1. c. 222, and cases cited. But it is answered that the petitioner is not the corporation. This is begging the question. Corporations can only act through their officers and agents, and their acts, when within the scope of their authority, are the acts of the corporation. The petitioner is the secretary of the corporation whose books were called for. He is the proper custodian of these books and papers and as such in respect to them, represents and speaks for the corporation, and they are as much entitled to the protection of the law in his hands as they would be if they were his own private property.

The right of the State to inquire into, supervise and regulate a semipublic corporation whose duty, under its charter, is to render a service to the public, is everywhere recognized; but not so with a private corporation, not required under its charter to perform any public service, but organized solely for the purpose of conducting a private business for the profit of its stockholders. The individual and property rights of the latter class of artificial persons are as sacred and entitled to the same protection under the law as are the individual and property rights of a natural person. The power to compel this class of corporations to produce its books and papers, as is attempted to be done in this case, for the purpose of showing that its officers have made a false or true return of its property to the tax assessor, as the tribunal making the inquiry may find, has never, in this State, been conferred upon any assessor, board of assessors, court,

grand jury or other tribunal. The Constitution stands as an insurmountable barrier to the exercise of such extraordinary power.